# IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

NETFLIX, INC.,
Appellant,

v.

BROADCOM, INC. AND VMWARE, LLC,
Appellees.

Appeal from the United States District Court for the Northern District of California, No. 5:24-CV-9324-PCP before Judge P. Casey Pitts

## APPELLEES BROADCOM, INC. AND VMWARE, LLC'S RESPONSIVE BRIEF

Ramy E. Hanna
McKool Smith, P.C.
600 Travis Street, Suite 7000
Houston, Texas 77002

Christopher P. McNett
McKool Smith, P.C.
1999 K Street NW, Suite 600
Washington, D.C. 20006

Steven J. Rizzi
McKool Smith, P.C.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
(212) 402-9400
srizzi@mckoolsmith.com

Charles E. Fowler, Jr.
McKool Smith, P.C.
303 Colorado Street, Suite 2100
Austin, Texas 78701

*Counsel for Defendants-Appellees Broadcom, Inc. and VMware, LLC*

# CERTIFICATE OF INTEREST

I certify that the following information is accurate and complete to the best of my knowledge:

**1.      The full names of every party or *amicus* represented by me are:**

   Broadcom, Inc. and VMware, LLC

**2.      The names of the real parties in interest represented by me are:**

   Not applicable

**3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amici curiae* represented by me are:**

   None

**4.      The names of all law firms and the partners or associates that appeared for the party or *amici curiae* now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:**

   Alan P. Block, McKool Smith P.C.

**5.      The title and number of any case known to me to be pending in this or any other court or agency that could directly affect or be directly affected by this court's decision in the pending appeal are:**

   None

**6.      Organizational Victims and Bankruptcy Cases. The information required under Fed. R. App. P. 26.l(b) (organizational victims in criminal cases) and 26.l(c) (bankruptcy case debtors and trustees) is:**

   Not applicable

*/s/ Steven J. Rizzi*
Steven J. Rizzi

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF CONTENTS............................................................... ii

TABLE OF AUTHORITIES .........................................................v

PATENT CLAIM LANGUAGE .....................................................ix

STATEMENT OF RELATED CASES ............................................... xii

INTRODUCTION .....................................................................1

STATEMENT OF THE ISSUES..................................................3

STATEMENT OF THE CASE.......................................................3

    I.     The Parties ...............................................................3

    II.    The Asserted Patents ..............................................4

        A.    The Cherkasova Patents ...........................4

        B.    The '893 Patent ..........................................7

        C.    The '122 Patent ..........................................11

    III.    Procedural History.................................................14

        A.    The District Court Decision .....................16

            1.    The Cherkasova Patents..............................16

            2.    The '893 Patent .......................................18

            3.    The '122 Patent .......................................19

        B.    Netflix's Second Amended Complaint and the Parties' Stipulation of Dismissal........................................20

SUMMARY OF ARGUMENT ..................................................22

STANDARD OF REVIEW ................................................................26

ARGUMENT ................................................................................27

THE ASSERTED PATENTS ARE INELIGIBLE UNDER
     SECTION 101 ........................................................................27

        C.     Virtualizing Computer Resources Was
               Known at the Time of the Patents................................28

        D.     The Cherkasova Patents are Ineligible.......................30

               1.     The Cherkasova Patents are Directed
                       to the Abstract Idea of Collecting and
                       Analyzing Information ....................................30

                       a)     Netflix's Step One Arguments Fail...............33

               2.     The Cherkasova Patent Claims Do
                       Not Recite an Inventive Concept...................39

        E.     The '893 Patent Claims Are Not Patent
               Eligible ......................................................................42

                1.     The '893 Patent Claims are Directed
                       to the Abstract Idea of Allocating a
                       Workload Across a Plurality of
                       Resources......................................................42

                       a)     Netflix's Step One Arguments Fail...............44

                2.     The '893 Patent Claims Do Not
                       Recite an Inventive Concept...........................50

        F.     The '122 Patent Claims are Not Patent
                Eligible ......................................................................52

                  1.     The '122 Patent Claims are Directed
                       to the Abstract Idea of Providing a
                       Graphical User Interface................................52

                       a)     Netflix's Step One Arguments Fail...............54

2. The '122 Patent Claims Do Not
Recite an Inventive Concept ............................................59

CONCLUSION ..............................................................................................61

CERTIFICATE OF COMPLIANCE ...........................................................63

CERTIFICATE OF SERVICE ....................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Affinity Labs of Tex., LLC v. Amazon.com, Inc.*,
   838 F.3d 1266 (Fed. Cir. 2016) ...............................................................32

*AI Visualize, Inc. v. Nuance Commc'ns, Inc.*,
   97 F.4th 1371 (Fed. Cir. 2024) ...............................................................41

*Alice Corp. v. CLS Bank International*,
   573 U.S. 208 (2014).........................................................................26, 53

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
   841 F.3d 1288 (Fed. Cir. 2016) .........................................................46, 47

*Ancora Technologies, Inc. v. HTC America, Inc.*,
   908 F.3d 1343 (Fed. Cir. 2018) ...............................................................46

*Appistry, Inc. v. Amazon.com, Inc.*,
   2015 WL 4210890 (W.D. Wash. July 9, 2015), *aff'd*, 676 F.App'x 1007
   (Fed. Cir. 2017)........................................................................................43

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018) ...............................................................26

*Beteiro, LLC v. Draftkings, Inc.*,
   104 F.4th 1350 (Fed. Cir. 2024) ..............................................................54

*Bot M8 LLC v. Sony Corp. of Am.*,
   4 F.4th 1342 (Fed. Cir. 2021) ..................................................................16

*Broadband iTV, Inc. v. Amazon.com, Inc.*,
   113 F.4th 1359 (Fed. Cir. 2024) ..............................................................53

*BSG Tech, LLC v. Buy Seasons, Inc.*,
   899 F.3d 1281 (Fed. Cir. 2018) ...................................................34, 42, 60

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
   927 F.3d 1306 (Fed. Cir. 2019) ...............................................................52

*ChargePoint, Inc. v. SemaConnect, Inc.*,
   920 F.3d 759 (Fed. Cir. 2019) .....................................................26, 27, 58

*Cirba Inc. v. VMware, Inc.*,
  2023 WL 2989049 (D. Del. Apr. 18, 2023) ......................................................50

*Coho Licensing LLC v. Glam Media, Inc.*,
  2017 WL 6210882 (N.D. Cal. Jan. 23, 2017), *aff'd*, 710 F.App'x 892
  (Fed. Cir. 2018).........................................................................................43

*Constellation Designs, LLC v. LG Electronics Inc.*,
  2026 WL 114206 (Fed. Cir. Apr. 28, 2026) ......................................................29

*Cooperative Entertainment, Inc. v. Kollective Technology, Inc.*,
  50 F.4th 127 (Fed. Cir. 2022) ........................................................51, 61

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
  880 F.3d 1356 (Fed. Cir. 2018)..........................................19, 58, 59

*CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*,
  15 F.4th 1091 (Fed. Cir. 2021) .....................................18, 19, 60, 61

*cxLoyalty, Inc. v. Maritz Holdings Inc.*,
  986 F.3d 1367 (Fed. Cir. 2021) ...............................................................32

*Data Engine Techs. LLC v. Google LLC*,
  906 F.3d 999 (Fed. Cir. 2018) ..............................................19, 58, 59

*Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*,
  758 F.3d 1344 (Fed. Cir. 2014) .............................................................37

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
  815 F.App'x 529 (Fed. Cir. 2020) .............................................35, 45

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016) ........................................17, 31, 34

*Ericsson Inc. v. TCL Communication Technology Holdings Ltd.*,
  955 F.3d 1317 (Fed. Cir. 2020) .............................................................43

*Finjan, Inc. v. Blue Coat Systems, Inc.*,
  879 F.3d 1299 (Fed. Cir. 2018) .............................................................28

*Free Stream Media Corp. v. Alphonso, Inc.*,
  996 F.3d 1355 (Fed. Cir. 2021) .............................................................28

*Genetic Techs. Ltd. v. Merial L.L.C.*,
818 F.3d 1369 (Fed. Cir. 2016) .........................................................................26

*GoTV Streaming, LLC v. Netflix, Inc.*,
166 F.4th 1053 (Fed. Cir. 2026) ....................................................................passim

*Hawk Tech. Sys., LLC v. Castle Retail, LLC*,
60 F.4th 1349 (Fed. Cir. 2023) ....................................................................44, 55

*In re Bd. of Trs. of the Leland Stanford Junior Univ.*,
989 F.3d 1367 (Fed. Cir. 2021) ....................................................................32, 34

*Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*,
50 F.4th 1371 (Fed. Cir. 2022) ....................................................................27, 28

*Intell. Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) ..............................................................29, 30, 33

*Internet Pats. Corp. v. Active Network, Inc.*,
790 F.3d 1343 (Fed. Cir. 2015) .........................................................................53

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
942 F.3d 1143 (Fed. Cir. 2019) ..............................................................38, 39, 55

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
566 U.S. 66 (2012).............................................................................................26

*Mentone Sols. LLC v. Digi Int'l Inc.*,
2021 WL 5291802 (Fed. Cir. Nov. 15, 2021) ...................................................48

*Optis Cellular Tech., LLC v. Apple Inc.*,
139 F.4th 1363 (Fed. Cir. 2025) ....................................................................42, 60

*Recentive Analytics, Inc. v. Fox Corp.*,
134 F.4th 1205 (Fed. Cir. 2025) ....................................................28, 48, 49, 50, 51

*SAP Am., Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018) .........................................................................32

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017) ...........................................................................26

*SRI Int'l Inc. v. Cisco Systems, Inc.*,
930 F.3d 1295 (Fed. Cir. 2019) ..............................................................33, 36, 37

*Synopsys, Inc. v. Mentor Graphics Corp.*,
839 F.3d 1138 (Fed. Cir. 2016) ..................................................................26, 32

*Trading Techs. Int'l, Inc. v. IBG LLC*,
921 F.3d 1084 (Fed. Cir. 2019) ..............................................................53

*Trustees of Columbia University v. Gen Digital, Inc.*,
169 F.4th 1320 (Fed. Cir. 2026) .........................................................passim

*Two-Way Media Ltd. v. Comcast Cable Communications, LLC*,
874 F.3d 1329 (Fed. Cir. 2017) ........................................................35

*Uniloc USA, Inc. v. LG Electronics USA, Inc*,
957 F.3d 1303 (Fed. Cir. 2020) ..............................................33, 35, 36, 37, 39

*US Patent No. 7,679,637, LLC v. Google, LLC*,
164 F.4th 1373 (Fed. Cir. 2026) ......................................................44, 55, 56, 57

*Visual Memory LLC v. Nvidia, Corp.*,
867 F.3d 1253 (Fed. Cir. 2017) .........................................................38, 39, 48

## STATUTES

35 U.S.C. § 101 ...................................................................................passim

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 12(b)(6) ........................................................14, 26

# PATENT CLAIM LANGUAGE

**U.S. Patent No. 7,779,424**

1.      A method comprising:

observing communication from a plurality of paravirtualized virtual machines (VMs) to driver domains that are isolated from the plurality of VMs, the communication comprising at least one resource request from the plurality of VMs to the driver domains, comprising observing communication from said plurality of VMs requesting access to a shared resource that is accessible by the plurality of VMs, wherein a device driver for said shared resource is arranged in said driver domains; and

determining, based on said communication between the plurality of VMs and the plurality of driver domains, CPU utilization of said plurality of driver domains attributable to the plurality of VMs, including determining a share of CPU execution attributed to each of the VMs during a predetermined time interval.

**U.S. Patent No. 7,797,707**

1.      A method comprising:

observing, in a computer, communication from a virtual machine (VM) to a domain in which a device driver for a shared resource resides, wherein the domain is separate from a virtual machine monitor (VMM); determining, in the computer and based on said communication, CPU utilization of said domain attributable to said VM; determining, for the VM, CPU utilization allocated by a scheduler to the VM; and

determining, for the VM, total CPU utilization attributable to the VM by summing the determined CPU utilization allocated to the VM by the scheduler and the determined CPU utilization of the domain attributable to the VM.

**U.S. Patent No. 8,799,891**

1.      A method comprising:

observing communication from a given virtual machine (VM) of a plurality of VMs, to a virtual machine monitor (VMM), by observing communication

from said VM that is requesting access to a resource, as an access request for said VM by said VMM; and

determining, based on said communication, utilization of the CPU by said VMM specifically attributable to said VM, and not attributable to any other of the plurality of VMs, wherein the utilization of the CPU by said VMM is the utilization of the CPU by said VMM performed for processing said access request for said VM by said VMM.

**U.S. Patent No. 8,185,893**

16. A method for use in a system having plural physical machines that contain active virtual machines, comprising:

receiving, at a load balancer, a request from a client;

in response to the request, determining whether at least one additional virtual machine should be started up;

in response to determining that at least one additional virtual machine should be started up, the load balancer sending at least one command to start up the at least one additional virtual machine in at least one of the physical machines;

determining, by the load balancer, whether a workload loading of the active virtual machines and the at least one additional virtual machine has fallen below a threshold;

in response to determining that the workload loading has fallen below the threshold, disabling a particular one of the active virtual machines and the at least one additional virtual machine;

a placement controller selecting placement of the active virtual machines and the at least one additional virtual machines on the physical machines to achieve a predefined policy;

computing, by the placement controller, indicators associated with corresponding plural different layouts of the active virtual machines and the at least one additional virtual machine on the physical machines, where the indicators provide information regarding performances of the corresponding layouts, and wherein each of the indicators is computed based on parameters associated with a corresponding one of the plural layouts;

comparing, by the placement controller, the indicators; and

selecting, by the placement controller, one of the plural layouts based on the comparing.

**U.S. Patent No. 8,863,122**

10.   A method, comprising:

providing a first graphical user interface (GUI) from a host computer to a remote computer, the first GUI displaying on the remote computer a list of a plurality of virtual machines and to enable a user of the remote computer to select one of the virtual machines from the list as well as an action to be performed on the selected virtual machine, the selected action to be performed on the selected virtual machine independent of the other of the plurality of virtual machines;

receiving user input from the remote computer via the first GUI, the user input including a selection of a virtual machine and an action to be performed on the selected virtual machine;

in accordance with the user input, performing the action using the host computer on the selected virtual machine; and

generating a second GUI to enable the user of the remote computer to select a virtual machine from the plurality of virtual machines to which a hardware peripheral device accessible to the remote computer is to be mapped;

wherein said action is selected from the group consisting of starting, stopping, re-booting and shutting down.

## STATEMENT OF RELATED CASES

No appeal in or from the same district court proceeding has been before this or any other appellate court.  Counsel for Defendants know of no other cases pending in this or any other court that may affect or be directly affected by this case.

## INTRODUCTION

The district court properly granted VMware's[1] motion to dismiss Netflix's First Amended Complaint ("FAC") based on patent ineligibility for each of the five asserted patents. The court studied the single claim from each patent that Netflix itself highlighted in its FAC with respect to both eligibility and infringement. Although the court did not address VMware's contention that such claims were representative of the other asserted claims for eligibility purposes, Netflix conceded representativeness in the parties' stipulation of dismissal of Netflix's Second Amended Complaint ("SAC") to pursue this appeal. Judgment against Netflix was then entered with respect to all asserted claims based on both the court's order granting the motion and the parties' stipulation. Thus, if this Court affirms the district court's judgment, as it should, the case is over.

Netflix's challenges to the district court's step one and step two analyses are easily dispensed under this Court's Section 101 precedent for patents relating to software innovations. All five patents pertain to methods used with software virtualization technologies, also referred to as "virtual-machines" ("VM"). Computer virtualization permits the resources of physical computers to be shared among multiple operating systems ("OS"). As one of the patents explains: "[A]

---

[1] Defendants Broadcom Inc. and VMware, LLC are collectively called "VMware."

virtual machine manages a system's physical resources and presents them to one or more OSs, thus creating for each OS the illusion that it has full access to the physical resources that have been made visible to it." Appx00035 (1:43–47). By the time the earliest of the five patents were filed in 2005, software virtualization was a well-established, commercialized technology that was pioneered by Defendants' predecessor, VMware, Inc. in the 1990s.

None of the patents are directed to new or improved methods of virtualizing computer resources, or improvements in the way the underlying physical machines operate. The methods of the representative claims determined ineligible are unlike those found by this Court to recite non-abstract technological improvements in computer-related fields. They use computers simply as tools to carry out various abstract tasks: information gathering and analysis (Cherkasova patents), workload allocation ('893 patent), and providing graphical user interfaces for remote control of virtual machines ('122 patent).

Netflix's step two arguments amount to a familiar refrain this Court has consistently rejected as supporting an inventive concept — that the abstract idea itself was unconventional.

The district court thus correctly determined that no fact issues stood in the way of resolving patent eligibility on the pleadings, and this Court should affirm.

## STATEMENT OF THE ISSUES

Whether the district court correctly determined that claim 1 of the '424 patent, claim 1 of the '707 patent, claim 1 of the '891 patent, claim 16 of the '893 patent, and claim 10 of the '122 patent are ineligible under 35 U.S.C. § 101.

## STATEMENT OF THE CASE

### I.     The Parties

Netflix is a video streaming company with no expertise in virtual-machine technology. Appx00385. None of the inventors named on the asserted patents worked for Netflix. Appx00029, Appx00046, Appx00064, Appx00078, Appx00092. VMware's predecessor, VMware, Inc., was incorporated in 1998 and pioneered the development of virtualization technologies that separate application software from the underlying hardware. Appx00796, n.2.

Broadcom became the ultimate parent of VMware through a corporate acquisition in 2023. Broadcom is a global technology leader that designs, develops and supplies a broad range of semiconductor and semiconductor-based solutions and infrastructure software solutions, with a more than 60-year history of innovation and more than 15,000 U.S. and foreign patents. Appx00414, n.101 (Broadcom Inc. 10-K dated December 14, 2023, at 10).

## II. The Asserted Patents

On November 25, 2024, Netflix acquired a portfolio of U.S. patents from a company in the British Virgin Islands, which had in turn acquired the patents from the original owner. Appx00791–92. The patents do not relate to Netflix's business. Appx00385. Less than one month later, on December 23, 2024, Netflix filed this case in the district court asserting infringement of five of those patents by VMware's virtualization software offerings. Appx00117–205. All five patents relate to the field of virtual-machines.

### A. The Cherkasova Patents

The Cherkasova ('424, '707, and '891) patents relate to collecting and analyzing CPU usage information in a virtual-machine environment. The claims recite no improvements to the virtual-machines or how they are managed. Netflix's assertion that the Cherkasova patents claim methods that "improve virtual-machine technology" (Brf.[2] 11) is contradicted by its acknowledgment that the patents claim no more than "a unique method for attributing CPU usage to a given virtual machine." *Id*. at 9. The claims recite no steps that use this attribution data, much less to improve or alter the operation of the VMs. The '424 patent specification confirms that the focus of the purported invention is removed from any improvement to VMs or VM technology. The patent makes clear that VM and

---

[2] "Brf." refers to Netflix's principal brief.

virtual machine management ("VMM") technology were well known at the time of the invention. Appx00035 (1:48–2:58). The claimed methods do not improve or alter this conventional technology in any way but simply provide more accurate CPU usage data for use with existing VM management systems. The patents do not identify any problem or drawback with these systems, but simply a "desire" for "accurately determining CPU utilization that is attributable to VMs on a system." Appx00035–36 (2:59–3:3).

Netflix identifies no specific improvement in virtual-machine technology, and instead makes only vague, generalized assertions that more accurate CPU utilization data "improves the performance of the underlying infrastructure" and "creates a more reactive and efficient system." Brf. 9. Netflix also contends that the more accurate data "assists" with various VM management functions. *Id.* The absence of any identified improvement in how VMs or VMMs operate further confirms that the claimed methods are far removed from any technological improvement this Court has recognized as patent eligible in computer-related fields. None of the claimed methods even recite any of the management functions that the CPU utilization data supposedly improves.

The detailed description of the patents further confirms that the asserted benefits realized from the claimed methods are speculative, attenuated from the VM/VMM technology itself, and non-specific. The '424 patent states that accurate

CPU attribution data "*may be* very important for certain management tasks." Appx00038 (8:43–47) (emphasis added). It then states that "migrat[ion]" of VMs "from one physical node to another" can "improve the overall performance of the underlying infrastructure" without providing any specifics. *Id.* (8:52–58). That's because the role of the claimed "CPU utilization monitor" is simply "[t]o support these [existing] management functions." *Id.*

The specification highlights how the claimed methods are not directed to a specific improvement in VM technology by emphasizing that they are not tethered to any specific application or system and instead "may be employed for various types of applications (*e.g.*, billing, resource utilization management, etc.) in any type of virtualized system that may be implemented." *Id.* (8:63–67). And although the patent asserts that "a) support of policy-based resource allocation; b) admission control of new VMs; c) support for VMs migration; and d) quality of service ("QoS") provisioning of VMs" are "examples" of "management tasks" where the methods "can be used," it offers not a single example of how the claimed methods are incorporated into any such tasks, much less how the VM technology or infrastructure is improved. *Id.* (8:36–41). That the claimed methods are divorced from the VMs and VMMs is further confirmed by the fact that the only disclosed embodiment for implementing the "operational flow" of "CPU utilization monitor 103" is "computer-executable software code that is stored to a computer-readable

storage medium" rather than a modification of any hardware or software used to implement the VMs or VMMs themselves. Appx00042 (16:12–15).

In sum, the Cherkasova patents fail to claim or describe a specific technological solution for VMs, how they are managed, or the computers on which they operate.

### B.     The '893 Patent

The '893 patent relates to managing the workload of multiple computing resources. Representative claim 16 of the '893 patent recites turning virtual machines on and off based on load and picking a "layout" of which virtual machines to run on which physical computers. Appx00088 (claim 16). The claims recite no specific method, just the broad concept of using a "threshold," "predefined policy," "indicators" and "parameters." *Id*.

The claim does not recite any specific technical improvement. It recites use of a "load balancer" and "placement controller," but does not specify how those components work. *Id*. It only describes what they are supposed to accomplish using functional, result-oriented language, making clear they are structureless black boxes. And although the claim references use of a workload loading "threshold" for determining whether to disable a virtual machine, selecting a layout to achieve a "predefined policy," and computing "indicators" that are based on "parameters" associated with a layout, it fails to specify what these vague terms

7

represent or how they are used to select a layout. *Id*. The claim does not even specify that the layout selected is "optimal," much less any specific method for making the selection beyond "comparing … the indicators." *Id*.

The specification does not support Netflix's assertion that the '893 patent is directed to an "optimal solution" to the "placement problem" for placing virtual machines on physical servers. Brf. 13–16. The "Summary" portion of the patent, consistent with its title ("Starting Up at Least One Virtual Machine in a Physical Machine by a Load Balancer"), references only the use of a "load balancer" to "start up additional virtual machines based on loading." Appx00083 (1:31–41). "Starting up a virtual machine refers to either activating an inactive virtual machine, or creating a new virtual machine." Appx00084 (3:45–47). The "load balancer" requires no unconventional hardware but is simply a "software module" "executable on one or more CPUs" in a "request server" that submits requests from client stations to physical machines. Appx00083–84 (2:15–22; 3:52–55); *see also* Appx00087 (10:1–9) ("[i]nstructions of software" for "load balancer" and "layout selector" are "loaded for execution on a processor" which "includes microprocessors, microcontrollers, processor modules or subsystems (including one or more microprocessors or microcontrollers), or other control or computing devices.").

Netflix's assertion that the '893 patent "solved both the power-consumption and the placement problems by identifying 'an optimal solution for placement of virtual machines on physical machines'" (Brf. 14) quotes the '893 patent, but the quoted sentence simply acknowledges that "identifying an optimal solution … is a relatively complex problem." Appx00085 (6:20–22). The patent then goes on to discuss the use of a "simulated annealing technique … to find an approximation of a globally optimal placement." Appx00085 (6:25–28).

Putting aside that the claims do not require use of this technique, the following paragraphs explain that it is a well-known mathematical process akin to the age-old human practice of trial-and-error. *Id.* (6:28–37) (technique starts with a "current set (that represents some random placement of virtual machines on physical machines), and iteratively adjusts the current set until a better set can be identified," which "process repeats until an approximated optimal solution is identified.").

Potential layouts for placing virtual machines on physical machines are assessed using a "goodness rating" determined by a "cost function" that applies weights to "resource loading criteria ... balancing criteria, cooling criteria, power criteria, and so forth." Appx00085 (6:37–54). "[T]he parameters corresponding to the current layout ... can be measured by the VM layout selector ... However, when considering alternative layouts (which are trial layouts not yet implemented) to

compare to the current layout, the parameters for the alternative layouts may have to be estimated (using an internal model provided with the VM layout selector), where the model can be generated based on historical information." Appx00086 (7:2–10).

The patent does not provide a specific implementation of any such "model," but simply mentions use of a "Tweak" subroutine "for modelling the change in the placement of virtual machines." *Id.* (8:11–15). "[T]he tweak can be a minor tweak, in which just one or two virtual machines are moved to different physical machines … In other implementations, other types of tweaks can be performed." *Id.* (8:23–31). Nor does the patent specify what combination of weights and criteria yields a goodness rating that corresponds to the "optimal solution for placement of virtual machines on physical machines." In sum, the specification lacks a specific technical solution and simply describes the abstract idea of applying a simulated annealing technique to the environment of virtual machine placement on physical machines.

Instead of the "simulated annealing technique," the patent briefly discusses use of a "genetic algorithm" where candidate layouts "are represented by genetic representations (in the form of genetic individuals that are made up of a set of genes)." Appx00087 (9:32–41). Additional "child genetic individuals" can be generated by a "cross-over operation" where "one genetic individual is combined

with another genetic individual." *Id.* (9:50–53). In addition to also not being claimed, the two paragraph, high level discussion of a "genetic algorithm" is purely conceptual and also lacks a specific technical solution.

Thus, the '893 patent does not claim or describe a specific solution to the "power consumption" or "placement" problems, but just the abstract idea of starting up/disabling VMs based on need and using performance indicators to place virtual machines on physical machines.

### C.     The '122 Patent

The '122 patent claims graphical user interfaces or "GUIs" that provide controls used to remotely manage virtual machines. Appx00103 (claim 10). Its claims recite no technical details or improvements to the computers themselves, but merely the high-level idea of GUIs for remotely managing virtual machines.

Representative claim 10 of the '122 patent recites a method using two separate GUIs that provide controls to "enable" various basic functions for remotely controlling VMs connected via a network. The claim does not recite how any of the functions are performed. *Id.*

Netflix's description of the '122 patent fails to identify any technical problem associated with the ability to remotely control virtual machines, much less a specific solution. Netflix suggests that "service processing logic," which is not even recited in claim 10, was an innovation of the patent. Brf. 17–21. But the

patent makes clear that "service processing logic comprises Hewlett-Packard Company's® Integrated Lights-Out® (iLO) service processor, or Onboard Administrator," *i.e.*, pre-existing software applications. Appx00100 (3:13–16); *see also* Appx00099–100 (2:63–3:4) (defining "service processing logic" under "Notation and Nomenclature" and identifying the same commercial products as "illustrative"). Netflix also asserts that the '122 patent provides a "universal interface" for "controlling virtual machines and their host servers … regardless of differences in the virtual machines' native design or interfaces." Brf. 18. But no such functionality is recited in claim 10, much less how to accomplish it. Indeed, the specification states that use with VMs that "are different from each other, each VM providing a different interface usable to interact with and control that VM," is only an "embodiment." Appx00099 (2:61–63).

Netflix also asserts that the functionality provided was previously "unavailable" (Brf. 18) and "a novel implementation" (*id.* 19, 22), which are not relevant to the eligibility inquiry. And the absence of any identifiable and specific technical problem or solution addressed by the patent is highlighted by Netflix's repeated assertions that the purported improvement is in the "software architecture" or "virtual machine architecture." Brf. 19, 20, 21, 23. Indeed, Fig. 3 of the patent, which Netflix highlights in its brief at 20 as "illustrat[ing]…the

claimed software architecture," is described as simply a "*conceptual* block diagram of an illustrative software architecture." Appx00099 (1:31–33) (emphasis added).

The '122 patent does not describe any improved structure or function for the two GUIs recited in claim 10. To the contrary, "the service processing logic generates on the display of the remote computer *the same GUIs* that would be generated on a display of the server." Appx00100 (3:61–66) (emphasis added).

Netflix asserts that a second improvement provided by the '122 patent is the ability to "virtualize" a hardware peripheral connected to the remote computer. Brf. 21. As an initial matter, claim 10 does not recite a method to accomplish such virtualization, but simply a "GUI to enable the user of the remote computer to select a virtual machine ... to which a hardware peripheral device accessible to the remote computer *is to be mapped*." Appx00103 (10:39–43) (emphasis added).

Netflix cites the '122 patent at Appx00102 (7:15–32) for the proposition that "[u]sers also lacked the ability to remotely load software to a target server." Brf. 17. But while the cited paragraph describes the process at a high level, it does not state that such functionality was lacking in existing systems. Indeed, the patent later explains that virtualization of, *e.g.*, a CD/DVD drive connected to the remote computer, is accomplished when the service processing logic "uses hardware and software to emulate ... a universal serial bus (USB) DVD drive coupled to a USB port on server 106 ... *using known techniques*." Appx00102 (8:4–10) (emphasis

13

added). In this manner, "the service processing logic 'virtualizes' the CD/DVD drive 50 as if the CD/DVD drive 50 was installed on the server 106 itself." *Id.* (8:10–13). The patent explains that "known techniques" can likewise be used to map the drive to a specific VM. *Id.* (8:27–34) ("Using known techniques, the VM 312 may gain direct access to server 106 peripherals.").

In sum, the '122 patent identifies no technical challenges associated with overcoming either of the alleged "limitations" Netflix asserts were present in then-existing systems. Brf. 17. As the above makes clear, the patent simply applies known, conventional software and techniques to the environment of remote management of VMs.

## III. Procedural History

Netflix's brief omits relevant aspects of the procedural history below. Netflix filed its original complaint on December 23, 2024. Appx00117–205. Rather than answer, on March 3, 2025, VMware moved to dismiss under Rule 12(b)(6) for failure to state a claim on the basis that all the asserted claims were not patent eligible. Appx00282–316. VMware's motion further challenged Netflix's claims for indirect and willful infringement as implausible. *Id.* Rather than responding to the motion, Netflix instead filed its FAC on March 17, 2025, seeking to bolster its allegations concerning patent eligibility in view of VMware's arguments. Appx00384–490.

For each patent, Netflix pasted in the entire text of one claim that anchored its eligibility allegations. Appx00388–394 at ¶¶23–35 ('424 patent; claim 1); Appx00394–399 at ¶¶37–48 ('707 Patent; claim 1); Appx00399–404 at ¶¶50–60 ('891 patent; claim 1); Appx00404–409 at ¶¶62–73 ('893 patent; claim 16); Appx00410–413 at ¶¶75–82 ('122 Patent; claim 10). Netflix paid lip service to a handful of other claims from each patent, but those allegations consisted largely of conclusory assertions and quotations of additional claim language, without any contentions as to whether and how the additional limitations impacted the eligibility analysis. Appx00392–394 at ¶¶30–33 ('424 patent); Appx00397–399 at ¶¶43–46 ('707 patent); Appx00402–404 at ¶¶55–58 ('891 patent); Appx00407–409 at ¶¶66–69 ('893 patent); Appx00412–413 at ¶¶79–80 ('122 patent).

VMware then renewed its motion to dismiss on March 31, 2025. Appx00783–817. VMware's motion focused on the single claim from each patent Netflix highlighted in its Amended Complaint. *Id*. VMware also briefly addressed the other claims identified in Netflix's FAC for each of the patents. Appx00803–804 (Cherkasova patents); Appx00807 at n.4 ('893 patent) and n.5 ('122 patent).

VMware further noted that although Netflix's infringement counts in the Amended Complaint listed multiple claims allegedly infringed for each patent, Netflix failed to include plausible allegations for all but the single claim of each patent highlighted in its eligibility allegations, which provided an alternate ground

15

for dismissal of such claims. Appx00804 (Cherkasova patents) and Appx00807 n.4 ('893 patent).

The motion was argued on May 29, 2025, and granted on August 8, 2025. Appx00025.

### A. The District Court Decision

### 1. The Cherkasova Patents

The district court addressed claim 1 of each of the three Cherkasova patents as a group consistent with how the parties treated them in their briefs below and Netflix's opening brief here. Appx00007. Netflix does not challenge the district court's conclusion that the differences between claim 1 of each patent were "de minimis" with the "primary difference" being "the type of information analyzed." Appx00010 n.3.

At the outset the district court noted that it need not resolve the dispute over representativeness of claim 1 of each patent because "the operative complaint fails to plead facts to plausibly allege infringement of any claims" other than claim 1 of each patent. Appx00008.[3] In doing so the district court pointed to a "particularly puzzling" inconsistency in Netflix's pleading. *Id.* On the one hand Netflix alleged

---

[3] Netflix contends that the district court's conclusion on this point was "*sua sponte*," and that VMware did not challenge the sufficiency of Netflix's infringement pleading for such other claims. Brf. 24. In fact, the district court cited the same authority VMware cited in support, *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1353 (Fed. Cir. 2021). Appx00007; Appx00804.

that other asserted claims in the patents included "unique limitations" and recited "additional and specific methods," but on the other alleged infringement of such claims only "in an entirely conclusory fashion." *Id.*

The district court fully addressed Netflix's step one arguments, considering the claim language and the specification to determine the focus of the claims and Netflix's assertion that the claims are directed to an "improvement to VM technology." Appx00011. The district court properly noted that any arguable technological improvements mentioned in the specification were not the focus of the claims. "Even by Netflix's own definition, the claims are directed to 'specific and improved methods for attributing CPU utilization based on VM communications' – not any subsequent steps using said attribution to improve the VMs, the VMMs, or their infrastructure." *Id.* The court thus determined that the claims were directed to the abstract idea of "improving the accuracy of certain information relating to the computer's operation." *Id.*

After considering the cases cited by Netflix, which it similarly relies on in its brief here, the district court found that the claims at issue "most closely resemble" those in *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016). Appx00013. At step two the district court correctly characterized Netflix's inventive concept arguments as "merely describ[ing] the method's use of the

abstract concept," and noted that each claim "provides no specific technical solution beyond the information gathering itself." Appx00015.

### 2. The '893 Patent

The district court held that claim 16 of the '893 patent is directed to "the abstract idea of allocating virtual machine work across a plurality of physical resources." Appx00019–20.[4] The court rejected Netflix's "technological solution" argument that the claim is directed to solving the "technical problem of managing VMs operating on the underlying physical machines, which optimizes power consumption and load balancing." Appx00018–19. The district court correctly found that the claim's reference to the use of "indicators," "thresholds," "predefined policy," and "parameters" was insufficient because "it includes no specifics and does not require any optimization of the placement of VMs on the servers." Appx00019. The district court also held that Netflix could not "import details from the specification" and that the lack of detail in the claim itself raised preemption concerns. *Id.*

The district court similarly pointed out at step two that "criteria and techniques contained only in the patent specification are critical to" Netflix's "technical solution" allegations. Appx00020. The court disagreed that *CosmoKey*

---

[4] As with the Cherkasova patents, the court did not address representativeness but dismissed Netflix's infringement claim for the '893 patent without prejudice as to all other asserted claims. Appx00016, n.5.

*Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091 (Fed. Cir. 2021) supported

Netflix's arguments that it could rely on such unclaimed details at step two because

"the inventive concept identified by Netflix … is not evident in the claim

language" which "merely recites generalized steps for allocating virtual machine

work across a plurality of physical resources to be performed on a computer using

conventional computer activity." Appx00020–21.

### 3.    The '122 Patent

The district court held that even accepting Netflix's position that claim 10 of

the '122 patent is directed to "'providing a user interface to remotely control

multiple virtual machines or map hardware peripheral devices,' the claim is

directed to an abstract and patent-ineligible subject matter." Appx00023.[5] The

court correctly held that: i) limiting the use of "GUIs, mapping, and remote

management" to a virtual machine environment was insufficient; ii) "there is no

claimed detail for how [the claimed] actions will actually be performed on the

VM"; and iii) "the claim merely recites that VMs are 'to be mapped,'" which is

"results-oriented language." Appx00023–24. The court also held that Netflix's

cited cases, *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356

(Fed. Cir. 2018), and *Data Engine Techs. LLC v. Google LLC* , 906 F.3d 999 (Fed.

---

[5] As with the Cherkasova patents, the court did not address representativeness but dismissed Netflix's infringement claim for the '122 patent without prejudice as to all other asserted claims. Appx00022, n.8.

Cir. 2018), were inapposite because "the claim at issue here does not involve a specific improvement to the user interface itself" or "any improved structure or function within the GUI, VMs, or technology, but rather a results-oriented abstract idea." Appx00024.

At step two the district court held that claim 10 lacked a "specific, discrete implementation of the abstract idea" and "specified details for accomplishing the results." Appx00024. The court further pointed out that "the patent specification makes clear that remote management systems and mapping existed and were conventional activities in the prior art." Appx00025. Netflix does not challenge this conclusion on appeal.

The district court thus dismissed Netflix's FAC with prejudice as to the five claims but granted Netflix leave to further amend its complaint with respect to the other asserted claims not addressed in its decision, and stayed all discovery until the filing of an answer to any such complaint. Appx00025–26.

## B. Netflix's Second Amended Complaint and the Parties' Stipulation of Dismissal

Although Netflix challenged representativeness in its opposition to VMware's motion to dismiss, and the district court addressed only the five claims in its decision, Netflix recognized that it lacked colorable arguments that any of the other asserted claims dismissed without prejudice could survive an eligibility challenge given the district court's decision. Netflix filed its SAC on September 5,

2025, but states that it did so to "preserv[e] its rights with respect to [the unadjudicated] claims on remand from this appeal." Brf. 25. Netflix's SAC made no changes to its eligibility allegations for any patent claims and simply attached its previously served Local Patent Rule infringement contentions as exhibits in response to the district court's determination that the FAC lacked plausible infringement allegations for all but the five invalidated claims. Appx02583–03615.

In response to Netflix's expressed intent to file its SAC, VMware reiterated its position that the invalidated claims were representative of the other asserted claims for eligibility purposes. To avoid further motion practice concerning the other claims, the parties filed a Joint Stipulation of Dismissal of the SAC with Prejudice where Netflix conceded representativeness. Appx03616. The stipulation states: "Each of the five claims held patent–ineligible in the Court's order of August 8, 2025, is representative of all other claims in the respective patent for purposes of patent eligibility under 35 U.S.C. §101, *i.e.*, the Court's analysis and conclusions in its August 8, 2025, order apply equally to such other claims." Appx03617. Judgment was then entered against Netflix given both the court's August 8, 2025, order and the parties' stipulation. Appx00027. Thus, if this Court affirms the district court's decision granting VMware's motion to dismiss the FAC, no claims from any of the asserted patents will remain to be adjudicated and the case will be resolved in its entirety.

21

## SUMMARY OF ARGUMENT

**A.** The district court correctly found each claim it considered from the five asserted patents ineligible under this Court's controlling precedent. Netflix's subsequent concession that the adjudicated claims were representative of all other claims in the respective patents fully resolved the case.

Each asserted patent pertains to the field of virtualization of computer resources, which the patents concede was a known, established technology by referencing VMware's predecessor as a source of commercial virtualization software at the time of the inventions. None of the patent claims are directed to specific new or improved methods of virtualization, or changes in the way the underlying physical computers operate.

**B.1** The claims of the three Cherkasova patents are directed to the abstract idea of collecting and analyzing information. Representative claim 1 of each of the Cherkasova patents includes only the steps of "observing communication" from a virtual machine and "determining, based on said communication" CPU utilization attributable to the virtual machine. The claims do not recite a specific technological solution to a technological problem. They recite no steps that make use of the attribution information for any purpose, much less improving the operation or management of the virtual machines, or the computers on which they run. Netflix

22

concedes as much by arguing that at best the methods merely "enabled" improvements in various unclaimed tasks associated with managing VMs.

Netflix's attempt to analogize the Cherkasova claims to those found eligible by this Court at step one fails because the claimed methods do not alter the normal operation of the virtual machines or the underlying physical machines. None of the purported benefits Netflix points to are realized by the methods claimed, but by then-existing and conventional virtual machine management software.

**B.2** Netflix points to no claimed elements, either alone or as an ordered combination, that transform the abstract idea of the claims into a patent-eligible application. Its conclusory inventive concept allegations amount to only the legally insufficient assertion that the claimed abstract idea itself was unconventional.

**C.1** The '893 patent claims are directed to the abstract idea of allocating a workload across a plurality of resources. Representative claim 16 recites turning virtual machines on and off based on load and picking a "layout" of which virtual machines to run on which physical computers. Netflix's contention that the claims are directed to optimizing virtual machine placement and migration is not only unsupported by the claim language, but insufficient to remove the claims from the abstract realm given their lack of specificity. The claimed method's use of broad, abstract terms such as "threshold," "predefined policy," "parameters" and

23

"indicators" do not specify "concrete action" as this Court requires to recite a specific technological improvement.

Netflix's contention that the claimed "load balancer" and "placement controller" provide a "specific architectural arrangement" fails because these terms are nothing but functional abstractions. Nor can Netflix rely on unclaimed detail in the specification to support its contention that the claims are directed to a sufficiently specific method of optimizing virtual-machine placement. The '893 patent does not claim or describe a specific solution to the "power consumption" or "placement" problems, but just the abstract idea of starting up/disabling VMs based on need and using performance indicators to place virtual machines on physical machines.

**C.2** Netflix contends that use of the "load balancer" and "placement controller," as well as "indicators" based on "parameters" and a "predefined policy" was unconventional. But here again Netflix's step two arguments fail as they collapse into reliance on the abstract idea as the inventive concept.

**D.1** Representative claim 10 of the '122 Patent is directed to the abstract idea of providing graphical user interfaces or "GUIs" though which users are presented with the ability to remotely control virtual machines. The capabilities of the two GUIs are recited using result-oriented functional language, with no specifics as to how the functions accessed through the GUIs are performed. One

24

graphical user interface is provided to "enable" remote users to start, stop, reboot, or shut down a virtual machine on the host computer. A second graphical user interface is provided to "enable" remote users to select a virtual machine to which a hardware peripheral connected to the remote computer "is to be mapped."

The '122 patent does not describe any improved structure or function for the two GUIs recited in claim 10 and instead explains that the method remotely presents the same GUIs generated on a display of the server for the virtual machines. Claim 10 does not recite a technological solution to a technological problem, and the claimed GUIs do not improve the operation of the virtual machines or the physical computers. Netflix's reliance on "service processing logic" fails because it is both unclaimed and described in the specification as provided by conventional software. At bottom, claim 10 recites nothing more than connecting a "remote computer" with a "host computer" via a network and "providing"/"generating" two GUIs "to enable" the remote control and mapping of virtual machines and peripherals using conventional hardware and software.

**D.2** As with the other patents, Netflix's step two arguments fail because they simply point to the abstract idea as supplying the inventive concept. Netflix's contention that the district court improperly resolved factual disputes is wrong because the court relied on the patent itself to conclude that remote management and mapping of virtual machines were conventional activities.

25

The district court's eligibility analysis was correct as to all five patents and claims considered. This Court should affirm.

## STANDARD OF REVIEW

Applying Ninth Circuit law, this Court reviews the grant of a motion to dismiss de novo. *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 909 (Fed. Cir. 2017); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1146 (Fed. Cir. 2016). "In analyzing whether the claims are patent eligible, [this Court] employ[s] the two-step analysis" first "articulated" by the Supreme Court in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012), and "further delineated" in *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014). *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 765 (Fed. Cir. 2019). "Patent eligibility under 35 U.S.C. § 101 is ultimately an issue of law" reviewed "de novo," though it "may" involve underlying factual disputes about "whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365, 1368 (Fed. Cir. 2018). This Court has "repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion." *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016).

## ARGUMENT

## THE ASSERTED PATENTS ARE INELIGIBLE UNDER SECTION 101

The district court correctly found each representative claim of the five asserted patents ineligible under this Court's controlling precedent. "An ineligibility analysis depends on 'the language of the[] [c]laims themselves.' … Although the specification's (and prosecution history's) recitation of the problem faced and the asserted inventive solution informs the inquiry into what the combination of claimed features is directed to [], only features that are claimed, not unclaimed details that appear in the specification, can supply something beyond ineligible subject matter—here, something beyond an abstract idea and sufficient to render the claims eligible." *GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1060–61 (Fed. Cir. 2026) (quoting *ChargePoint*, 920 F.3d at 769–70; internal citations omitted).

"In cases involving software innovations, [the step-one] inquiry often turns on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies [as] an abstract idea ...." *Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1377 (Fed. Cir. 2022) (alterations in original). To be patent-eligible, a software-based innovation must "make 'non-abstract improvements to computer technology.'" *Trustees of Columbia University v. Gen Digital, Inc.*, 169 F.4th 1320, 1329 (Fed. Cir. 2026)

(quoting *Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299, 1304 (Fed. Cir. 2018)). But "claims that recite something 'already routine and conventional' are not sufficient ... [T]he use of 'conventional or generic technology' cannot alone constitute a technological improvement." *Id.* (internal citation omitted).

With respect to functional claim language in the context of a Section 101 analysis, this Court recently further noted:

> "[T]he claim itself 'must identify "how" that functional result is achieved by limiting the claim scope to structures specified at some level of concreteness, in the case of a product claim, or to concrete action, in the case of a method claim.'" *Free Stream Media Corp. v. Alphonso, Inc.*, 996 F.3d 1355, 1363 (Fed. Cir. 2021) (quoting *Am. Axle & Mfg., Inc. v. Neapco Holdings, LLC*, 967 F.3d 1285, 1302 (Fed. Cir. 2020)). Claims that "do not delineate steps through which the [relevant] technology achieves an improvement" are insufficient for patent eligibility. *See Recentive*, 134 F.4th at 1213 (citing *Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1381 (Fed. Cir. 2022))."

*Id.*

## C. Virtualizing Computer Resources Was Known at the Time of the Patents

The asserted patents all pertain to the field of virtualization of computer resources or virtual-machine technology, but this does not mean the claims are necessarily directed to technological improvements. All of the claims at issue are method claims, and the assessment of whether the claims specify sufficiently "concrete action" is informed by what was known in the field at the time of the invention, lest technical claim language be mistaken for technological specificity.

*Constellation Designs, LLC v. LG Electronics Inc.*, 2026 WL 114206 at *8 (Fed. Cir. Apr. 28, 2026) (patentee's admissions that various elements of claimed digital communication system were known "support[s the Court's] view that the claims are not as specific in techniques as Constellation contends.").

The patents have priority dates of 2005 or later, when virtual machine technology was already prevalent in the market. For example, the Cherkasova patents, which have the earliest priority date of the asserted patents (March 2, 2005), acknowledge that "[m]any such VMMs [Virtual Machine Monitors] are available in the art, such as the VMM known as Vmware™ available from VMware, Inc. An abstraction created by VMM is called a virtual machine (VM)." Appx00035 (1:58–61). VMware, Inc. is VMware's predecessor.

This Court has not yet directly addressed the eligibility of patent claims specific to the field of virtual-machines. But the Court's decisions in *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016), and *Trustees of Columbia*, 169 F.4th 1320 (Fed. Cir. 2026), both of which involved computer virus screening, another computer-specific technology, provide a helpful framework for the analysis, especially for step one. The *Intell. Ventures* court noted that, like virtualization of computer resources, "the idea of virus screening was [] well known," "[p]erforming virus screening was a long prevalent practice in the field of computers," and "[b]y itself, virus screening … constitutes an abstract idea." 838

29

F.3d at 1319. The court further noted in its step one analysis that the claim at issue "does not claim a new method of virus screening or improvements thereto—in fact, it requires only 'detecting … a virus in the computer data.'" *Id.* The Court's *Trustees of Columbia* decision reiterated this analysis: "[A] claim that 'does not claim a new method of virus screening or improvements thereto' and does not 'improve or change the way a computer functions' is directed to an abstract idea." *Trustees of Columbia*, 169 F.4th at 1329 (quoting *Intell. Ventures*, 838 F.3d at 1319–20).

As addressed further below, none of the claims at issue are directed to new or improved methods of virtualization, or improvements or changes in the way computers function. Nor do any of the claims recite an inventive concept that takes them outside the realm of an abstract idea.

### D. The Cherkasova Patents are Ineligible

#### 1. The Cherkasova Patents are Directed to the Abstract Idea of Collecting and Analyzing Information

Claim 1 of each of the Cherkasova patents includes only two steps, both of which are abstract. The methods first "observ[e]" communication from each virtual machine requesting resources, and then uses those communications to "determine[]" how much CPU usage is attributable to each virtual machine. Netflix contends that the claimed methods achieve "technical benefits" but admits that the CPU usage information produced by the methods merely "enabled"

improvements in various unclaimed tasks associated with managing VMs. Brf. 35–36 (citing "more reliable admission control," "informed virtual machine migration," and "improved quality-of-service performance").

The focus of the claimed methods is simply collecting (*i.e.*, "observing") and analyzing (*i.e.*, "determining") information to allocate usage of shared resources. But observing individual usage of a shared resource and accounting for its contribution to total usage is a conventional, well-known practice across a wide range of fields. For example, many law firms have long allocated and billed costs of a Westlaw or Lexis subscription based on the observed usage of the service on behalf of each client.

The claims are analogous to those held abstract in *Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016), involving methods for detecting events in a power grid. Like the claims here, the *Electric Power* claims focused on collecting data, analyzing the data, and then "deriving a composite indicator of reliability." *Id*. at 1352. The court explained that analyzing information "by [the] steps people go through in their minds" or by "mathematical algorithms" is well within the "abstract-idea category." *Id*. at 1353–54.

Moreover, the claimed "determining, based on …" steps of the claims lack specifics as to *how* the determining is performed, and consist solely of classic, result-oriented functional language that further demonstrates their abstract nature.

"The purely functional nature of [a] claim confirms that it is directed to an abstract idea, not to a concrete embodiment of that idea." *Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016); *see also cxLoyalty, Inc. v. Maritz Holdings Inc.*, 986 F.3d 1367, 1378 (Fed. Cir. 2021) ("[T]he claims provide no useful guidance as to how this purported function is achieved and thus cannot be directed to a technological solution.").

Even accepting that the claimed methods improve the accuracy of calculations for determining CPU utilization for VMs, such an advance "lies entirely in the realm of abstract ideas" and is "ineligible for patenting." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018) (claims directed to "nothing but a series of mathematical calculations based on selected information and the presentation of the results of those calculations"); *see also In re Bd. of Trs. of the Leland Stanford Junior Univ.*, 989 F.3d 1367, 1369, 1372 (Fed. Cir. 2021) (claims directed to a "method for receiving certain types of genetic data and processing the data by performing mathematical calculations and statistical modeling").

Further confirming their abstract nature, the claimed steps can be performed by humans using pencil and paper. *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1146–51 (Fed. Cir. 2016).  By observing a list of VM requests in a given time interval, individual utilization could be determined by hand for each

VM. Where "there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper," they are directed to an abstract idea. *Intell. Ventures I*, 838 F.3d at 1318.

a) Netflix's Step One Arguments Fail

Netflix's step one arguments rely primarily on *Uniloc* and *SRI*, but neither involved claims analogous to the Cherkasova patent claims. Brf. at 32–40. Contrary to Netflix's argument, the *Uniloc* court did not hold that claims "recit[ing] a new application of a known data field in the standard transmission process" was sufficient to render the claims non-abstract. Brf. 33. The claim there improved conventional communications between primary and secondary stations by "including a data field for polling as part of the inquiry message" from the primary station. *Uniloc USA, Inc. v. LG Electronics USA, Inc*, 957 F.3d 1303, 1305 (Fed. Cir. 2020). The addition of the data field altered the normal operation of, *e.g.*, Bluetooth systems by "allowing primary stations to send inquiry messages and conduct polling simultaneously." *Id*. The patent indicated that this change in operation "eliminates or reduces the delay present in conventional systems where the primary station alternates between polling and sending inquiry messages." *Id.* at 1307–08. "And this change in the manner of transmitting data results in reduced response time by peripheral devices which are part of the claimed system." *Id.* at 1308.

In contrast, the claimed methods in the Cherkasova patents do not alter the operation of the computers running the VMs, the VMs themselves, or the manner in which VMs communicate with "driver domains" ('424 patent), "domains" ('707 patent) or "VMMs" ('891 patent). Indeed, Netflix concedes that the claimed methods do nothing more than "improve the accuracy of CPU attribution" (Brf. 33), which does not address or solve a technical problem. *See BSG Tech, LLC v. Buy Seasons, Inc.*, 899 F.3d 1281, 1288 (Fed. Cir. 2018) ("[A]n improvement to the information stored by a database is not equivalent to an improvement in the database's functionality."). And Netflix's repeated contention that the methods utilize "previously ignored communications" (Brf. 27, 28, 34, 35, 39, 40, 42) is an implicit admission that the "claims in this case do not even require a new source or type of information, or new techniques for analyzing it." *Elec. Power*, 830 F.3d at 1355. "Even accepting the argument that the claimed process results in improved data," that does not salvage it from being directed to an ineligible abstract idea. *Stanford*, 989 F.3d at 1373.

Netflix asserts that more accurate CPU attribution enables "the virtual-machine architecture" to "better (and earlier) adapt to changing conditions," which "creates a more reactive and efficient system that is less prone to overload and capacity issues" and "more accurately also assists with admission control of new

34

virtual machines, virtual-machine migration, and quality of service (QoS) provisioning." Brf. 9; *see also* Brf. 35–36.

Netflix's arguments highlight that the claims here are more like those found ineligible in *Two-Way Media Ltd. v. Comcast Cable Communications, LLC*, 874 F.3d 1329 (Fed. Cir. 2017), than the *Uniloc* claims. The *Uniloc* court noted that "the [*Two-Way Media*] claims recited a method of transmitting packets of information over a communications network," 957 F.3d at 1308, and that the court there rejected Two-Way Media's technological improvement arguments, which are similar to Netflix's arguments:

> Two-Way Media argued that the claims solved data transmission problems, including load management and bottlenecking, but the claimed method was not directed to those improvements. *Id.* at 1336–37. We therefore held the claims ineligible because they merely recited a series of abstract steps ("converting," "routing," "controlling," "monitoring," and "accumulating records") using "result-based functional language" without the means for achieving any purported technological improvement. *Id.* at 1337.

*Uniloc*, 957 F.3d at 1308.

The Cherkasova claims are even more abstract, reciting only the steps of "monitoring" and "determining" and similarly "without the means for achieving any purported technological improvement" in "virtual-machine architecture." And Fig. 1 of the patent (annotated at Brf. 11) depicts "CPU Utilization Monitor" 103 as a single box, highlighting the result-oriented nature of the claims. *See Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F.App'x 529, 533 (Fed. Cir. 2020) (claimed

advance of an "access checker" was "nothing but a functional abstraction," that "the specification largely treats … as a black box"). *Uniloc* thus does not support eligibility, because the claims here are more like the *Two-Way Media* claims held ineligible.

In *SRI*, the claims were "directed to a technological solution to a technological problem," specifically "providing a network defense system that monitors network traffic in real-time to automatically detect largescale attacks." *SRI Int'l Inc. v. Cisco Systems, Inc.*, 930 F.3d 1295, 1303 (Fed. Cir. 2019). The *SRI* claims went far beyond simply observing data to improve the accuracy of CPU attribution and were instead directed to a "specific technique" for "identifying hackers or potential intruders into the network" – "using network monitors to detect suspicious network activity based on analysis of network traffic data, generating reports of that suspicious activity, and integrating those reports using hierarchical monitors." *Id.*

In concluding the *SRI* claims were more like those in *DDR Holdings* than *Elec. Power*, the *SRI* court emphasized that "the claims actually prevent the normal, expected operation of a conventional computer network." *Id.* at 1304. The district court correctly reached the opposite conclusion below with respect to the Cherkasova patents, finding that *Elec. Power* was more on point and citing this critical difference. Appx00012–13.

Contrary to Netflix's argument, "using previously unused sources of information to improve the virtual-machine environment" (Brf. 34) is not enough to pass muster at step one. In both *Uniloc* and *SRI*, the claims altered the conventional operation of the technology at issue whereas here the claims accomplish no more than creating more accurate CPU usage data that can purportedly be used in conventional processes for managing VMs. In this respect the Cherkasova claims are more analogous to those at issue in *Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.,* 758 F.3d 1344 (Fed. Cir. 2014), which involved a method for combining data into a "device profile" for use in image processing. The *Uniloc* court's explanation of why the *Digitech* claims were not patent-eligible applies equally here: "Although the claimed device profile could purportedly be used in reducing image distortion, merely generating the claimed device profile did not alone reduce image distortion or otherwise improve image processing. The claims were not directed to a patent-eligible technological improvement but recited 'the ineligible abstract idea of gathering and combining data that does not require input from a physical device.'" *Uniloc*, 957 F.3d at 1308 (cleaned up).

Netflix wrongly accuses the district court of "divorcing the claims from the written description" in its step one analysis Brf. 35. First, "[a]lthough the specification is relevant to the construction of claims, 'reliance on the specification

37

must always yield to the claim language in identifying focus.'" *Trustees of Columbia*, 169 F.4th at 1329. And the district court addressed the paragraph of the specification of the '424 patent Netflix repeatedly cites to at 8:43–9:2, concluding that it "makes clear that any alleged improvement to the overall performance of the underlying infrastructure is due to that [sic] fact the information about CPU utilization generated through the method can then be used to permit 'migration' of VMs from one physical node to another when the current physical node capacity is insufficient." Appx00011. Indeed, this paragraph serves only to confirm that the purported invention is an abstract idea as the "embodiments" discussed are of the "CPU utilization monitor described herein," and not any method for improving VM technology. Appx00038–39 (8:61–9:2).

The paragraph dispels any notion that that the claimed CPU attribution method is itself a technological improvement by explaining that its purpose is to "support [the] management functions" performed by existing conventional VMM architectures "such as the Xen$^{TM}$ architecture." Appx00038 (8:47–61).

For the same reasons the claims at issue do not resemble claims that merely failed to "expressly recite" the alleged advantages or benefits of the invention as in *Uniloc* and *Visual Memory LLC v. Nvidia, Corp.*, 867 F.3d 1253 (Fed. Cir. 2017), or a last "application step" as in *Koninklijke KPN N.V. v. Gemalto M2M GmbH,* 942 F.3d 1143 (Fed. Cir. 2019); Brf. 36–38. In each case the claims were directed

to *specific* methods that altered and improved *specific* technological processes, as made clear by the patent specifications. *Uniloc*, 957 F.3d at 1308 ("claimed invention changes the normal operation of the communication system itself to 'overcome a problem specifically arising in the realm of computer networks.'") (citing specification)); *Visual Memory*, 867 F.3d at 1259 ("specification explains that multiple benefits flow from the '740 patent's improved memory system"); *KPN*, 942 F.3d at 1151 (no dispute that "varying the way check data is generated provides an improvement to an existing technological process").

Netflix also accuses the district court of "requir[ing] the claims to set forth every advancement for purposes of eligibility." Brf. 37. But what the court actually did is correctly note that the "improvement in VM technology" touted by Netflix "is not recited in the claims themselves." Appx00011. This Court recently confirmed the district court's analysis was proper. "The problem is these supposed improvements are not what the claims are directed to, *i.e.*, the supposed improvements are not required by the language of the asserted claims at all." *Trustees of Columbia*, 169 F.4th at 1331 ("It cannot be said that the claims are directed to a technological improvement when nothing in the claims require the steps necessary to make the improvement.").

> **2.** **The Cherkasova Patent Claims Do Not Recite an Inventive Concept**

This Court recently noted that the step-two inquiry "often overlaps with the step-one inquiry," and that "as a practical matter, few of our cases have involved a determination favoring the patent owner at step two after a determination favoring the challenger at step one." *GoTV*, 166 F.4th at 1067. And although step two is a distinct inquiry from step one, "they commonly align" as is the case here. *Id.* The Cherkasova patent claims fall into a familiar category of claims routinely found to lack an inventive concept – claims using "functional, result-focused language or [] ordinary computers and networks to perform their ordinary functions in carrying out an abstract idea … without going further to require a specific implementation to improve *how* those functions are carried out." *Id.*

Netflix alleges that "attributing CPU usage based on [] specific virtual-machine communications" and "use of previously ignored communications for CPU attribution" supplies an inventive concept. Brf. 41–42. Netflix made a similar argument below, and the district court properly rejected it as "merely describ[ing] the method's use of the abstract concept addressed at step 1." Appx00014. That "the claims themselves recite the previously ignored communications" (Brf. at 42) is thus of no moment. Netflix does not dispute that the claimed methods "can be implemented on conventional virtualization platforms" but again simply rehashes its step one arguments in contending that this fact is "not dispositive" because "using this data in this manner was unconventional and inventive." Brf. 42–43.

This argument fails as a matter of law. "A claim cannot rest on the patent-ineligible concept alone to transform the invention into something significantly more than that concept." *AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1379 (Fed. Cir. 2024).

Netflix also wrongly criticizes the district court for "faulting the claims for not reciting downstream uses of the CPU-utilization information." Brf. 43. But the district court properly concluded that claim 1 of each Cherkasova patent "provides no specific technical solution beyond the information gathering itself" and that any purported improvements in VM technology are "unclaimed and properly disregarded as untethered to the claim language." Appx00015. As this Court held in *GoTV*, "information gathering and combining are themselves abstract," and "[a]ny speed and efficiency benefits are those made available by ordinary computers and networks and thus do 'not confer patent eligibility on an otherwise abstract idea.'" *GoTV*, 166 F.4th at 1068 (citation omitted).

The Cherkasova patent claims are similarly methods of "information gathering and combining" claimed using functional, result-focused language – "observing" communications and "determining, based on said communications … CPU utilization." (e.g., '424 patent, claim 1). And the specification makes clear that the role of the CPU attribution information is simply "[t]o support management functions" performed by conventional VM technology, such as

"migrat[ing] [virtual machines] from one physical node to another when the current physical node capacity is insufficient." Appx00038 (8:52–63) ("The CPU utilization monitor described herein may be advantageously employed for use in management of such a system.").

Finally, Netflix's conclusory step two allegations in the FAC did not raise factual disputes that precluded dismissal. Netflix does not point to a specific factual dispute underlying the step two analysis that the district court supposedly resolved against it but cites only its conclusory allegations that the patents "recite 'an unconventional technical solution' to a 'technical problem.'" Brf. 40–41. This Court has "repeatedly made clear that a conclusory assertion about an inventive concept … is insufficient." *GoTV*, 166 F.4th at 1068. Thus, Netflix's allegations that the Cherkasova patents "recite 'an unconventional technical solution' to a 'technical problem' in virtualized computing environments" does not avoid dismissal. And even if credited, such allegations regarding the claims as a whole are not directed to the relevant inquiry: "whether the claim limitations other than the invention's use of the ineligible concept to which it was directed were well-established, routine and conventional." *Optis Cellular Tech., LLC v. Apple Inc.*, 139 F.4th 1363, 1380 n.11 (Fed. Cir. 2025) (quoting *BSG Tech.*, 899 F.3d at 1290).

### E. The '893 Patent Claims Are Not Patent Eligible

#### 1. The '893 Patent Claims are Directed to the Abstract Idea of Allocating a Workload Across a Plurality of Resources

Representative claim 16 of the '893 patent is directed to allocating a workload (virtual machines and the requests they handle) across a plurality of resources (a system of physical machines), an abstract idea. "[A] divide-and-conquer approach where multiple computers collaborate on a single task is an abstract idea." *Trustees of Columbia*, 169 F.4th at 1330; *see also Coho Licensing LLC v. Glam Media, Inc.*, 2017 WL 6210882, at *6 (N.D. Cal. Jan. 23, 2017), *aff'd*, 710 F.App'x 892 (Fed. Cir. 2018) ("divide and conquer in the area of distributive computing" is an "abstract idea"); *Appistry, Inc. v. Amazon.com, Inc.*, 2015 WL 4210890, at *2 (W.D. Wash. July 9, 2015), *aff'd*, 676 F.App'x 1007 (Fed. Cir. 2017) ("The patents-in-suit recite the abstract idea of distributed processing akin to the military's command and control system …").

As with the Cherkasova patents, the method can be performed by a person. "[C]ontrolling access to resources is exactly the sort of process that 'can be performed in the human mind, or by a human using a pen and paper,' which we have repeatedly found unpatentable." *Ericsson Inc. v. TCL Communication Technology Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020) (citation omitted). As claimed in the '893 patent, a human could monitor requests to a system, increase or decrease the number of virtual-machines used to process those requests and decide which physical computers to run those virtual machines. This is little different from a bakery deciding how many ovens to turn on or off based on how

43

many loaves of bread are needed, and determining an arrangement of which baked goods should go into which ovens, or a shipping company determining how many boxes are needed to transport a set of goods, and how to allocate and arrange the goods in the boxes — human-performable abstract concepts.

The district court correctly characterized claim 16 of the '893 patent as "recit[ing] nothing more specific than the abstract idea of allocating virtual machine work across a plurality of physical resources." Appx00019–20. Netflix contends "claim 16 is directed to improving the operation of virtualized-computing systems by optimizing virtual-machine placement and migration." Brf. 46. But even were this Court to accept Netflix's narrowed characterization, it should "still conclude the claims are directed to the patent-ineligible abstract idea of [optimizing virtual-machine placement and migration], rather than any specific technological improvement, because they do not 'describe *how* the alleged goal of [optimizing virtual-machine placement and migration] is achieved.'" *US Patent No. 7,679,637, LLC v. Google, LLC*, 164 F.4th 1373, 1377–78 (Fed. Cir. 2026) (quoting *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1357 (Fed. Cir. 2023)).

a)     Netflix's Step One Arguments Fail

Netflix asserts that the claimed "load balancer" and "placement controller" provide a "specific architectural arrangement" for the method of claim 16. Brf. 45.

But the patent makes clear that both consist of software running on ordinary computer components. Appx00084 (3:52–55) ("The load balancer … can be software modules that are executable on one or more CPUs in the request server which CPU(s) is (are) connected to a storage 148."); *Id.* (4:66–5:14) ("As depicted in FIG. 1, each placement controller includes one or more CPUs and memory … The placement controller also includes a VM layout selector … [and] a migration control module … In some implementations, the VM layout selector and migration control module are software modules executable on the CPU of the placement controller.").

These two claim terms thus recite nothing more than functional "black boxes" as shown in Fig. 1 (Brf. 15). *See Dropbox, Inc.*, 815 Fed.App'x at 533 ("access checker" was "nothing but a functional abstraction" that "specification largely treats … as a black box"). At best, these terms, and the claimed methods as a whole, provide "additional factors" that may be considered in allocating VMs across physical machines, which "is not a 'specific technique' for improving a computer, but a change in the abstraction providing the fundamental principles for" resource allocation. *Id*; *see also GoTV*, 166 F.4th at 1066 (mere assertion of "'architecture' in the claim does not support a technological improvement because such a "highly general label[], without further identification of details … can apply to the abstract idea itself").

The specification of the '893 patent confirms that claim 16's functional language and use of vague, non-specific "indicators," "parameters," and "predefined policy" fail to recite "how" optimal placement in achieved. It expressly states that "[t]he placement problem for identifying an optimal solution for placement of virtual machines on physical machines is a relatively complex problem." Appx00085 (6:20–22). It then recites an "embodiment" not recited in the claim – a "simulated annealing technique" that "iteratively adjusts" a "random placement of virtual machines on physical machines" based on a "cost function." *Id.* (6:28–41).

Neither of the two Federal Circuit cases Netflix cites supports its position that the '893 patent claims are directed to a "technological improvement, not an abstract goal." Brf. 46. The claimed method in *Ancora* was found patent eligible because it "specifically identifie[d] how [a non-abstract computer] functionality improvement is effectuated" and "rel[ied] on specific and unique characteristics of certain aspects of the BIOS that … were not previously used in the way now claimed." *Ancora Technologies, Inc. v. HTC America, Inc.*, 908 F.3d 1343, 1348–49 (Fed. Cir. 2018). The claim in *Amdocs (Israel)* required computer code that used accounting information correlated to a "first network accounting record" to "enhance" that record. *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1299 (Fed. Cir. 2016). The court noted that it had previously construed

"enhance" to have a specific meaning based on the intrinsic record: "to apply a number of field enhancements in a distributed fashion," and that the claimed "distributed enhancement was a critical advancement over the prior art" such that the "claim entails an unconventional technological solution." *Id.* at 1300.[6] Here Netflix does not contend that any of the terms in the '893 patent claims should be limited in view of the intrinsic record or accorded anything other than their plain meanings.

Netflix wrongly accuses the district court of "requiring that the claim expressly recite 'optimal' placement to be directed to a technological improvement." Brf. 46–47.[7] In fact, the district court properly based its conclusion on the "lack of detail" in the claim, noting that it "could preempt load-balancing or workload management of virtual machines based on any 'indicators,' 'thresholds,'

---

[6] The inventive concept of "distributed enhancement" was similarly captured by the other patents at issue in *Amdocs (Israel)*. *Id.* at 1302-06.

[7] There is nothing inconsistent in the district court's analysis of the '893 patent compared with the Cherkasova patents on this point, which Netflix mislabels as "irreconcilable." Brf. 47 n.5. In both cases the district court was responding to Netflix's technological improvement arguments, which were equally unsupported by the claim language of the respective patents. For the Cherkasova patents, the court noted that "the specification makes clear that any alleged improvement to the overall performance of the underlying infrastructure is due to that fact the information about CPU utilization generated through the method can then be used to permit 'migration' of VMs," which was not recited in the claims. Appx00011. And for the '893 patent, the court highlighted that "[t]he problem with Netflix's argument is that the 'optimal' placement is not claimed by the invention." Appx00019.

47

'predefined policy,' or 'parameters,' not just those detailed in the specification."

Appx00019. The district court's analysis was spot on. As this Court recently noted,

"the terms on which *GoTV* relies, notwithstanding any first-blush appearance of

technical specificity, have broad meanings that, individually and taken together,

cannot support a conclusion that the claim is directed to a concrete

computer/network advance." *GoTV*, 166 F.4th at 1066. "Allowing a claim that

functionally describes a mere concept without disclosing how to implement that

concept risks defeating the very purpose of the patent system." *Recentive*

*Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1213 (Fed. Cir. 2025).

Nor did the district court "improperly disregard[] the written description" in

its step one analysis. Brf. 47–49. Netflix's reliance on *Visual Memory* here fails for

the same reasons this Court held the claims in *GoTV* "critically different": "The

claims in *Visual Memory* were specifically about the characteristics of a

computer's memory system, assertedly creating an improvement in this basic

component of a computer, the improvement focusing on its interaction with the

computer's processor(s)—which is a far cry from claiming mere use of ordinary

computer components for a particular subject matter." *GoTV*, 166 F.4th at 1067.

Netflix's reliance on *Mentone Sols. LLC* is also misplaced as the claim there

included a coined term that required reference to the specification. *Mentone Sols.*

*LLC v. Digi Int'l Inc.*, 2021 WL 5291802, at *2, *4 (Fed. Cir. Nov. 15, 2021).

The specifics in the written description Netflix points to at 47–48 are of no help to Netflix because "only features that are claimed, not unclaimed details that appear in the specification, can supply something beyond ineligible subject matter—here something beyond an abstract idea and sufficient to render the claim eligible." *GoTV*, 166 F.4th at 1061; *Trustees of Columbia*, 169 F.4th at 1331 ("It cannot be said that the claims are directed to a technological improvement when nothing in the claims require the steps necessary to make the improvement."). The claims do not require "optimal placement," "an iterative process," use of a "cost function" or "goodness function," or weighing of factors related to "resource loading, balancing, cooling or power." Brf. 48.

Netflix also asserts that claim 16 cannot be performed by the human mind but fails to explain why a person would be incapable of monitoring parameters such as workloads, power consumption, and temperatures of physical machines, manually starting up, disabling and migrating virtual machines, and computing and comparing performance indicators associated with different layouts.[8] Claims for "computer-assisted methods … are not made patent eligible under § 101 simply because they speed up human activity." *Recentive*, 134 F.4th at 1214.

---

[8] Netflix asserts the claim requires "dynamically migrating virtual machines," Brf. 50, but the claim is silent as to any temporal constraints on the performance of the steps.

Finally, the district court properly distinguished the District of Delaware's

decision in *Cirba Inc. v. VMware, Inc.*, 2023 WL 2989049 (D. Del. Apr. 18, 2023),

correctly noting that the claim there required three parameters for use in converting

virtual servers from one platform to another – "technical, business, and workload

constraints" rather than an amorphous "'predefined policy' with no

particularization whatsoever." Appx00019 at n.7.[9]

###### 2. The '893 Patent Claims Do Not Recite an Inventive Concept

As with the Cherkasova patents, Netflix's step two arguments fail to identify

"an inventive concept sufficient to transform the claimed abstract idea into a

patent-eligible application." *Recentive*, 134 F.4th at 1215. Netflix points to the

same claim elements discussed in its step one argument – "a specific architecture

involving a load balancer and a placement controller," as well as "indicators"

based on "parameters" and a "predefined policy," and contends that "*using such

elements* to determine virtual machine placement—and to migrate virtual machines

accordingly—was not well-understood, routine, or conventional at the time of the

---

[9] The *Cirba* claim included additional specificity not present here: "analyzing said existing virtual guests and hosts based on technical, business and workload constraints by evaluating each virtual guest against each virtual host and other virtual guests using one or more rule sets pertaining to said technical, business and workload constraints to determine guest-host placements[.]" *Cirba*, 2023 WL 2989049, at *2.

invention." Brf. 51–52 (emphasis added).  But "this is no more than claiming the abstract idea itself." *Recentive*, 134 F.4th at 1215.

Here again, Netflix's assertion that claim 16 "recites an unconventional technical solution to problems of power consumption and virtual-machine placement" (Brf. 51) through its functional language does not pass muster because the claim does not "require a specific implementation to improve *how* those functions are carried out." *GoTV*, 166 F.4th at 1067 (emphasis in original). Netflix asserts that the inventive concept "appears plainly … in the 'load balancer' and placement controller'" and seeks to distinguish *Ericsson* on this basis. Brf. 54. But as noted above, these terms are simply labels for functional abstractions that cannot supply the inventive concept.

Netflix again accuses the district court of "resolving the factual dispute about unconventionality against *Netflix*," but similarly fails to identify a specific allegedly inventive concept beyond use of the abstract idea itself.  *Id.* at 52. Netflix's reliance on *Cooperative Entertainment, Inc. v. Kollective Technology, Inc.*, 50 F.4th 127, 132–133 (Fed. Cir. 2022), is misplaced. Brf. 52–54. The Court there found two *specific*, allegedly inventive concepts *recited in the claims*: i) "a particular network structure for sharing content through a dynamic P2P network;" and ii) "the use of trace routes to segment content in [the claim's] dynamic P2P network structure." 50 F.4th at 131, 135. And in both cases the specification

explained the benefits of each. *Id.* Here Netflix's allegations concerning the improvements realized by the claimed method are tethered not to any inventive concept recited in the claim but to the abstract idea itself. *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306 (Fed. Cir. 2019) is similarly inapposite. There, the claims "recite[d] a specific, plausibly inventive way of arranging devices and using protocols," a "two-step, two-device structure." *Id.* at 1316–19. Here, as noted above, Netflix's conclusory allegation that claim 16 "recites a specific architecture" does not withstand scrutiny because the "load balancer" and "placement controller" are nothing but functional black boxes that don't add any unconventional structure. Supra at Section C.1.a.

F. **The '122 Patent Claims are Not Patent Eligible**

1. **The '122 Patent Claims are Directed to the Abstract Idea of Providing a Graphical User Interface**

Representative claim 10 of the '122 patent is directed to the abstract idea of providing a graphical user interface or "GUI." The claimed method is straightforward and not technical. One graphical user interface is provided to "enable" remote users to start, stop, reboot, or shut down a virtual machine on the host computer. A second graphical user interface is provided to "enable" remote users to select a virtual machine to which a hardware peripheral connected to the remote computer "is to be mapped." That the GUIs are used to remotely manage virtual machines does not take the claim outside the realm of an abstract idea.

*Alice*, 573 U.S. at 223 ("limiting the use of an abstract idea to a particular technological environment" insufficient for eligibility).

The claim does not provide any technological solution, such as a specific virtual machine technology or network communication protocol, to a specific technological problem. Rather, the claim is directed to arranging content for use in controlling virtual machines in two graphical user interfaces. Where "the claims do not recite an improved structure or function" within a product, "but rather, are directed to arranging content in a particular order," that "is not a sufficient technological solution to a technological problem, but rather a results-oriented abstract idea." *Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1363, 1368–69 (Fed. Cir. 2024) (invalidating claims directed to user interface for controlling access to programs).

Claims directed to user interfaces are routinely found to be abstract. *See, e.g., Internet Pats. Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1344–45, 1348 (Fed. Cir. 2015) ("method of providing an intelligent user interface" ineligible). For example, a user interface that makes the user "faster and more efficient, not the computer" is "not a technical solution to a technical problem." *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1090 (Fed. Cir. 2019) (user interface for trading ineligible). Here, the claimed user interfaces do not make the computer work any better. Rather, the claims describe the abstract idea of providing

conventional controls through a GUI used to perform conventional VM management functions, such as starting and stopping virtual machines and connecting peripherals.

a)     Netflix's Step One Arguments Fail

Netflix disputes that claim 10 of the '122 patent is directed to providing a graphical user interface (Brf. 55), but the district court held the claim directed to an abstract idea even under Netflix's articulation of "providing a user interface to remotely control multiple virtual machines or map hardware peripheral devices." Appx00023. Similar to the '893 patent, Netflix's contention that the claim "implements" a "specific software architecture" (Brf. 56) is belied by the claim language. And its argument that the architecture merely "*enables* centralized remote control of virtual machines" confirms it is not directed to a specific technical solution because "claims ... drafted using largely (if not entirely) result-focused functional language, containing no specificity about how the purported invention achieves those results ... are almost always found to be ineligible for patenting under Section 101." *Beteiro, LLC v. Draftkings, Inc.*, 104 F.4th 1350, 1356 (Fed. Cir. 2024).

Claim 10 recites that the first GUI is for "displaying on the remote computer a list of a plurality of virtual machines and to *enable* a user of the remote computer to select one of the virtual machines as well as an action to be performed on the

54

selected virtual machine," and the second GUI serves "to *enable* the user …to select a virtual machine … to which a hardware peripheral device … *is to be mapped*," without specifying how any of these functions are accomplished. Appx00103 (10:22–45) (claim 10).

This is precisely the type of result-focused functional language routinely found to lack a specific solution such that the claim "amount[s] to a mere implementation of an abstract idea." *Hawk Technology Systems*, 60 F.4th at 1358 (quoting *KPN*, 942 F.3d at 1152). *US Patent No. 7,679,637* is illustrative, where the claims at issue were for a web conferencing system including first and second client applications. 164 F.4th at 1376. This Court highlighted the result-oriented claim language, which (for one claim at issue) recited that the two applications were "'arranged to allow' certain results," and that the system was "'able to' achieve simultaneous recording and observing of current and previously presented parts of a computer screen video and data stream." *Id*. at 1378. For the other claim at issue this Court similarly highlighted that the claim "recites that 'a first client application … *allows* at least one presenting participant to share data streams comprised of audio data and computer screen video data' and 'a second client application … *allows* at least one observing participant to sense said data streams' in real time and asynchronously." *Id.*

The *US Patent No. 7,679,637* appellant made essentially the same argument Netflix makes here concerning the '122 patent, *i.e.*, that the claims were not result-oriented because they recite "two client applications enabling the manipulation … of multiple data streams and thus 'expressly explain how the systems need to be set up to accomplish the improvement.'" *Id*; *cf.* Br. 59 ("[C]laim 10 expressly recites *how* the remote control and mapping functions are achieved: by supplying a host-provided first GUI that enables a remote computer to control a virtual machine and its host system, and by generating a second GUI that enables mapping a virtual machine or its host to a remote hardware peripheral device.").

This Court did not agree. "The claims are result-oriented because they do not explain how the client applications achieve the recited manipulation of the data streams to enable asynchronous review." *US Patent No. 7,679,637*, 164 F.4th at 1378. And similar to *US Patent No. 7,679,637*, Netflix's reliance on the specification changes nothing. Netflix points to "service processing logic" recited in the specification and claim 12 as evidence that "claim 10 is directed to a concrete technological implementation." Brf. 59–60. As an initial matter, representative claim 10 does not require the use of "service processing logic," and Netflix forfeited any argument that its inclusion in claim 12 impacts the patent eligibility analysis through the stipulation of dismissal. Appx03617.

Moreover, the portions of the patent cited by Netflix establish that "service processing logic 210" is simply a functional black box (Fig. 3) implemented with generic components and existing VM software, and itself described in functional, result-oriented terms as "provid[ing] a user connected to the service processing logic with the ability to control and manage one or more servers or hardware partitions to which the service processing logic couples. The Hewlett-Packard® iLO® or Onboard Administrator are illustrative of such service processing logic." Appx00099 (1:63–2:4). The specification does not describe any improvements or modifications to such existing applications.

Thus, as in *US Patent No. 7,679,637*, "the written description does not disclose any improvement to the underlying components to enable [remote control and mapping]." 164 F.4th at 1378 (citing patent's use of "known client applications" and "'components [that] resemble those of similar components in existing web conferencing … applications'"). Nor does the "written description … suggest [that] the use of two [GUIs for remote control and mapping] was a technical solution to any problem facing the inventor[s]." *Id.* Netflix itself describes the "problems" allegedly addressed by the '122 patent as the inability to "remotely control multiple virtual machines from a single interface" and "remotely load software or map peripheral devices to a virtual machine running on a remote server." Brf. 55–56. But the "solution" of claim 10 is nothing more than

connecting a "remote computer" with a "host computer" via a network and "providing"/"generating" two GUIs "to enable" the "user of the remote computer" to remotely control/map VMs/peripherals using conventional hardware and software. Appx00103 (claim 10).

The purported invention is thus similar to that in *ChargePoint*, where the claim was directed to "the abstract idea of communicating requests to a remote server and receiving communications from that server, i.e., communication over a network." 920 F.3d at 767. "[T]he specification suggests that the invention of the patent is nothing more than the abstract idea of communication over a network for interacting with a device, applied to the context of electric vehicle charging stations." *Id.* at 768. A similar analysis applies here. The '122 patent simply provides for networked connection of existing technologies to allow for remote control via GUIs. "[T]he specification never suggests that the [VMs themselves are] improved from a technical perspective, or that [they] would operate differently than [they] otherwise could. Nor does the specification suggest that the invention involved overcoming some sort of technical difficulty in adding [remote control] capability to the [VMs]." *Id.*

Netflix's attempt to analogize the claim to the user interfaces at issue in *Core Wireless* and *Data Engine* fails for the reasons noted by the district court: Claim 10 "does not involve a specific improvement to the user interface itself" as

in *Core Wireless* or a "'specific method for navigating through three-dimensional electronic spreadsheets'" as in *Data Engine*. Appx00024 (quoting *Data Engine*).

### 2. The '122 Patent Claims Do Not Recite an Inventive Concept

As with the other patents, Netflix largely repeats its step one arguments in contending that claim 10 of the '122 patent recites an inventive concept, again pointing to the abstract idea itself as allegedly supplying the inventive concept. For example, Netflix points to "a discrete software architecture" that "enables remote- control and mapping functionality." Brf. 62. But Netflix's "highly general labels," *GoTV*, 166 F.4th at 1066, and conclusory allegations do not alter the fact that the claim recites nothing more than functionally described GUIs implemented in a conventional manner.

Netflix's reliance on the inclusion of "service processing logic" in dependent claim 12 similarly does not add a non-abstract inventive concept. In addition to being absent from representative claim 10, as noted above, "service processing logic" is simply a label for software that implements the abstract idea of remote management of VMs. Supra at Section D.1.a.

Netflix also contends that the district court's statement that "remote management systems and mapping existed and were conventional activities in the prior art" entailed disputed facts. Brf. 63. But Netflix points to nothing in the patent or the record as a whole evidencing any dispute concerning either activity.

Indeed, the district court's statement was supported by citations to the patent making clear that "remote management systems" were known (Appx00100 (4:4–7)) and the claimed ability to enable mapping of hardware peripherals relied on "known techniques." Appx00102 (8:27–32). Netflix does not contend that the district court misconstrued the patent. All Netflix cites is four paragraphs from its FAC, which Netflix points to as supporting a "specific alleg[ation]…that *the claimed invention* was 'unconventional.'" Brf. 63–64 (emphasis added). But apart from being conclusory, this is not the relevant inquiry. *BSG Tech*., 899 F.3d at 1290 ("the relevant inquiry is not whether the claimed invention as a whole is unconventional or non-routine"); *Optis Cellular*, 139 F.4th at 1380, n.11 (quoting *BSG Tech.,* 899 F.3d at 1290).

Netflix asserts that "plausibly recit[ing] an unconventional arrangement" with support from the specification amounts to sufficient "allegations of inventiveness," relying on *CosmoKey* and *Coop. Ent.* But in *CosmoKey* the "claim limitations [were] more specific," and the court cited the specification as confirmation that "the claims recite an inventive concept by requiring a *specific set of ordered steps* that go beyond the abstract idea identified by the district court." 15 F.4th at 1099 (emphasis added). No such specificity or order is present in claim 10 (or claim 12), which although styled as a method claim, simply recites various functions "enable[d]" by two GUIs, not the performance of a set of steps in a

particular sequence as in *CosmoKey*. *Id.* And in *Coop. Ent.*, the alleged inventive concept was a "particular network structure" and the claim "delineate[d] both the network's structure and function." 50 F.4th at 131. There, the specification supported the patentee's inventive concept allegation because it emphasized how a particular "structural limitation" was "different from and improves upon the prior art." *Id.* at 132. Here Netflix points solely to the same abstract, functional steps to support its inventive concept allegations. In sum, there is no inventive concept.

## **CONCLUSION**

This Court should affirm the district court's judgment.

Dated: May 14, 2026

Respectfully submitted,

*/s/ Steven J. Rizzi.*
Steven J. Rizzi
McKool Smith, P.C.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
(212) 402-9400
srizzi@mckoolsmith.com

Charles E. Fowler, Jr.
McKool Smith, P.C.
303 Colorado Street, Suite 2100
Austin, Texas 78701
(512) 692-8700
cfowler@mckoolsmith.com

Ramy E. Hanna
McKool Smith, P.C.
600 Travis Street, Suite 7000
Houston, Texas 77002
(713) 485-7300
rhanna@mckoolsmith.com

Christopher P. McNett
McKool Smith, P.C.
1999 K Street NW, Suite 600
Washington, D.C. 20006
(202) 370-8300
cmcnett@McKoolSmith.com

*Counsel for Defendants-Appellees*
*Broadcom, Inc. and VMware, LLC*

62

# CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Fed. Cir. R 28(b)(1)(A) and 32(b)(1) because it contains 13,815 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Equity 14-point font.

*/s/ Steven J. Rizzi*
Steven J. Rizzi

# CERTIFICATE OF SERVICE

On May 14, 2026, I electronically filed this document with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system, which served it on all counsel of record.

*/s/ Steven J. Rizzi*
Steven J. Rizzi